**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Lakisha Myers, as Special Administrator ) <br> Of the Estate of MICHAEL D. MYERS, SR.) <br> Deceased, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CITY OF CHICAGO, et al. ) <br> ) <br> Defendants. ) | | Case No. 14 C 4136 <br><br> Magistrate Judge Weisman |

## DEFENDANTS' MOTION TO ADMIT THE VIDEO RECORDED TESTIMONY OF DOCTOR ARIEL GOLDSCHMIDT

Defendants William Ingvoldstad, Alejandro Guerrero, and the City of Chicago, through one of their attorneys, move for this Court to permit the video recorded testimony of Doctor Ariel Goldschmidt to be played to the jury during trial. In support, Defendants state:

### Introduction

This matter concerns the death of Michael Myers and whether Officer Ingvoldstad's use of deadly force was justified. The medical examiner who performed the autopsy of Myers – Doctor Ariel Goldschmidt – is currently a medical examiner in Rhode Island and unavailable for trial. Pursuant to agreement between the parties, Defendants arranged for Doctor Goldschmidt's trial testimony to be video recorded in anticipation of playing the video for the jury. Not until several days after the agreement and after all arrangements had been made did Plaintiff lodge her first objection to this video testimony. Given the important nature of Doctor Goldschmidt's testimony and Plaintiff's earlier agreement to the video testimony, the Court should deny Plaintiff's request to bar Doctor Goldschmidt's testimony and allow it to be played for the jury.

**Argument**

The Court should permit the video recorded trial testimony of Doctor Goldschmit to be played in lieu of reading his deposition. First, it is the best medium in which to present Doctor Goldschmidt's testimony given his unavailability for trial. Second, Plaintiff agreed to this video testimony initially and Defendants have relied upon that agreement to their detriment should the testimony be barred.

I. Doctor Goldschmidt's video recorded testimony is the best method to present his testimony at trial.

At the outset, it is important to note that the video recording at issue is not a deposition. It is not, as Plaintiff's counsel has argued, a "second deposition" or "second bite at the apple." Rather, the video recording is of testimony as it would be presented to the jury at trial.[1] The questioning is focused solely on the relevant issues and was conducted in a manner consistent with the direct examination parameters as governed by the federal rules, instead of the relaxed nature of those of a deposition. Indeed, the video testimony covered only topics initially discussed during the deposition, albeit in a more concise, coherent, and admissible way. Importantly, the video testimony was taken in a manner consistent with the agreement between the parties – the very agreement that Plaintiff now seeks to violate in an attempt to exclude the testimony.

The Court should not be persuaded to bar the video testimony. It is well-established that live witness testimony is the most preferred manner in which to present evidence at trial. *See, e.g. Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 308 (7th Cir. 2010). Live testimony

---

[1] The video testimony is akin to an Illinois evidence deposition, although such a classification does not exist in federal courts.

allows the jury the opportunity to watch and gauge the demeanor of the witness in determining credibility, one of their critical responsibilities at trial, in a way not possible through the reading of a deposition. As courts have recognized, "[p]laying a video deposition is superior to reading a deposition because the jury gets to see and hear the witness testify, which both enhances the jury's attention and permits it to make credibility determinations. *Stollings v. Ryobi Technologies, Inc.*, No. 08 C 4006, 2015 WL 4100479, at *5 (N.D.Ill. July 6, 2015) (Feinerman, J.); *also Burden v. CSX Transp., Inc.*, No. 08 C 04-DRH, 2011 WL 379664, at *21 (S.D.Ill. Aug. 24, 2011) (Herdon, C.J.) ("while juries do not favor depositions over live testimony, they do prefer video depositions over written transcripts only."). So, although the video testimony is not a recorded deposition, it is nonetheless the most preferred way to present the testimony of Doctor Goldschmidt during trial. Indeed, to quote Judge Rowland on this matter, the reading of a deposition is "deadly for a jury." *See* A*ugust 26, 2016 Transcript of Proceeding* attached hereto as Exhibit A at pgs. 7:25- 8:1-2,

The video testimony allows the jury to gauge the demeanor of Doctor Goldschmidt in a way reading the deposition transcript does not. Any argument to the contrary would be disingenuous at best. The jury can see how Doctor Goldschmidt responds to the questions and how he gives his answer, essential factors in weighing his credibility. There is no question that the jury would be deprived of this critical aspect of testimony should they be presented only with a volunteer − with no knowledge of the issues or subject matter − reading from a deposition transcript.

The video testimony is vital for another reason, it allowed Doctor Goldschmidt to use a demonstrative exhibit to explain his testimony. During his deposition, Doctor Goldschmidt was forced to explain the wound paths using a two-dimensional drawing. Human beings are not two-

dimensional. During his video testimony, on the other hand, Doctor Goldschmidt was able to explain the wound paths in the body using a three-dimensional dummy. This allowed him to show where the bullet entered Myers' body and the route it took through the vital organs before lodging in the right side of Myers' back. This was the fatal shot. The wound path is a critical issue at trial as it tends to make it less probable that Theophilus Tines – Plaintiff's sole eyewitness – is accurately describing the shooting. Put simply, the bullet's wound path through the decedent's body, a subject on which Doctor Goldschmidt is eminently qualified to discuss as an experienced medical examiner, makes it nigh impossible for the shooting to have occurred as Tines described, based solely on the medical evidence. It is important for the jury to receive this testimony in the most concise and informative manner possible. That manner is the video testimony. As such, the Court should deny Plaintiff's request to bar this testimony.

II. <u>Plaintiff's agreement to the video testimony should prevent her from now raising an objection after Defendants reasonably relied on the agreement to their detriment.</u>

There is no dispute that Doctor Goldschmidt is unavailable for trial. He is currently a medical examiner in Providence, Rhode Island. A witness is deemed unavailable if "the witness is more than 100 miles from the place of hearing or trial . . . ." Fed.R.Civ.P. 32(a)(4)(B). The distance from Chicago, Illinois to Providence is much greater than 100 miles.[2]

Upon discovery that Doctor Goldschmidt was no longer employed with the Cook County Medical Examiner's Office, Defense Counsel called Doctor Goldschmidt to talk about the import of his role in this trial and to determine how to best present his trial testimony. Given his schedule, Doctor Goldschmidt cannot travel to Chicago, Illinois to testify live. Defense counsel then discussed the possibility of having him testify "live" at the trial via skype video-

---

[2] Approximately 969 miles. *See* google.com/maps (last visited September 6, 2016).

conferencing technology. However, given the uncertain scheduling regarding the date, time, and duration of his testimony, this option was also deemed impractical.

Realizing the problems an uncertain timeframe would present for the medical examiner, Ms. Boudreaux called Mr. Orozco on the phone and told him the witness was not able to testify live and that she wanted to fly to Rhode Island to videotape the trial testimony of this witness. Mr. Orozco said that "made sense" and had no objection whatsoever to the testimony proceeding in this manner. In fact, to this day, he still admits there was a firm agreement between the parties as to how to proceed. Ms. Boudreaux told him over the phone and in written correspondence that she would be using a dummy of the human body and rods to show the direction of the wound paths resulting from both gunshots. This phone call occurred sometime after noon on Tuesday, August 23. *See* email correspondence attached hereto as Exhibit B. After that, Ms. Boudreaux followed up this conversation with an email, memorializing the same. *See* email correspondence attached hereto as Exhibit C at ¶¶1-2. This was a firm agreement with no objections, and no qualifications. Notices of the videotaped testimony went out on Wednesday August 24, 2016. *See* Exh. B at pgs. 2-3 and this same agreement was again memorialized via written correspondence, with no objection on that same afternoon. *See* Exh. C. Further, the demonstrative exhibits were listed in Defendants' proposed pretrial order, which was provided to Plaintiff on August 24, 2016.

In reliance upon the August 23 agreement to conduct Doctor Goldschmidt's video testimony, Defendants booked and paid for hotel rooms and round-trip flights to Rhode Island. Defendants also arranged for a court reporter and videographer in Rhode Island and a court reporter in Chicago which had the capability of being able to video conference the plaintiff in so they could physically observe the examination that defense counsel would do in Rhode Island.

5

It was not until Thursday, August 25 that Plaintiff first raised any objection whatsoever to the video testimony of Doctor Goldschmidt. On that date, Greg Kulis, the principal of Mr. Orozoco's firm, called Ms. Boudreaux and stated that he first learned of this videotaped testimony that day and that he objects to it going forward, despite having been emailed detailing the logistics of the deposition on August 24. Mr. Kulis conceded that an agreement was reached, but still maintained his objection to the video testimony occurring in any way. Plaintiff then filed <u>two</u> emergency motions in from of Magistrate Judge Rowland in an attempt to prevent the video testimony. Magistrate Judge Rowland rejected those attempts after first admonishing Plaintiff's counsel that such an issue was not an emergency. Exh A at 2:12-18, 3: 8. Second, Magistrate Judge Rowland stated that such video testimony was commonplace; an issue on which Mr. Kulis agreed. *Id.* at 12: 9-25, 13: 1-10. The Judge understood clearly why a party would want to have "live" testimony instead of a discovery deposition. *Id.*, *generally*.

The actual basis for Plaintiff's objection, as admitted by Mr. Kulis, is not the procedural aspect of Doctor Goldschmidt's video testimony, but the subject matter. "I think probably when I learned of this, what kind of set me off is all of a sudden bringing in dummies and showing the trajectory of the bullets which, again, set me off in another direction." *Id.* at 13: 12-15. Indeed, this was one of the basis for Plaintiff's initial emergency motion. *See Docket No. 97* at 2. Put differently, Plaintiff's objection is not to the video testimony itself, but to what Doctor Goldschmidt testified to in the video testimony.

Plaintiff's objection to this subject could have been, and should have been, addressed by Plaintiff in a motion *in limine*. Indeed, during his deposition, Doctor Goldschmidt discussed the wound path of the bullet through Michael Myers' body. *See Deposition of Ariel Goldschmidt* attached hereto as Exhibit D, at 40: 7-24, 41: 1-20, 42: 1-17. Plaintiff's counsel was not only

6

present for this opinion regarding the wound path, but asked questions on that subject. *Id.* at 80: 1-24, 81: 1-4, 84: 7-24, 85: 1-7. Further, the bullet's wound path was documented in Doctor Goldschmidt's autopsy report. *See Defendants' Trial Exhibit 9* attached hereto as Exhibit E at 2. At no time has Plaintiff moved to bar Doctor Goldschmidt from testifying as to the wound path caused by the bullet once it entered Michael Myers' body. With good reason as such a motion would likely have no solid basis.

As Doctor Goldschmidt stated, he is trained and has many years of experience identifying injuries to the human body that caused death. Included within this area of expertise is documenting injury paths – such as wound paths of bullets – from the starting point of the injury to its conclusion. Doctor Goldschmidt's documentation that bullet number 1 entered Michael Myers' left chest, travelled in a downward and rightward direction, and stopped in Myers' right back is well within this area of expertise. The use of a human dummy and trajectory rods as a demonstrative to show this wound path is proper in order to better explain this testimony to the jury.

Mr. Kulis' substantive objection to this testimony is that the medical examiner is testifying about things not within his foundational knowledge or not disclosed. First, the disclosure issue is a non-starter. Dr. Goldschmidt was specially disclosed as an 26 A(2) expert, one not requiring a report, and that disclosure was inclusive of testifying to things within his knowledge, training and experience, all within a reasonable degree of medical certainty. *See Defendants' 26 (a) (2) disclosures* attached hereto as Exhibit F. Just as a medical examiner can talk about a toxicology report, which Mr. Kulis has no objection to; a medical examiner can talk about the genesis of a wound path within a body. *See Doctor Goldschmidt's trial testimony* attached hereto as Exhibit G at, pgs. 37-22 and 38-10.

In fact, pathology of a wound is exactly what a medical examiner studies, reports on and to which he subsequently testifies. *Id*. at 21-25 There is absolutely nothing objectionable in asking a medical examiner what they can glean from a wound paths, and confirm that there are many different angles that one can put either the gun, or the target at to create such wound paths. This, of course, is all with the admission that because a medical examiner is not present at the time of death, he is unable to say what position the gun or the target was in at the time of the shooting. This is simple geometry, which frankly, should be in the ken of any lay person.

Unbelievably, Mr. Kulis is taking the position that the medical examiner is only to testify as the case of death being gunshot wounds- an issue that is not in dispute in this case. *Id*. at p 19-20, trial testimony. This argument is belied by both the discovery deposition and the trial testimony of this doctor, in this case, much of which was done under Mr. Kulis' own questioning. *Id*. 23-15, 25-20, Mr. Kulis completely ignores the pages upon pages of evidence discussing the pathology and directional angles of each wound and highlights a one sentence opinion at the end of the report that says the case of death is multiple gunshot wounds. *See* Exh. E, *see also*, Exh. G at pgs. 20-4, 25-6, 28-13.

## **Conclusion**

Wherefore, for the foregoing reasons, Defendants respectfully request this Court allow Defendants to use the videotaped trial testimony of Dr. Ariel Goldschmidt at trial.

                                                                             Respectfully submitted,

                                                                             */s/ Jessica L. Griff*

Jessica L. Griff
Assistant Corporation Counsel
30 N. LaSalle, STE 900
Chicago, IL 60602
(312) 744-2826

*/s/ Shawn Barnett*
Shawn Barnett

*/s/ Barrett Boudreaux*
Barrett Boudreax

## **CERTIFICATION**

I, the undersigned attorney, certify that I filed the foregoing Motion to Admit the Video Taped Testimony of Dr. Ariel Goldschmidt with the Clerk of the Northern District of Illinois using the electronic filing system. As a result, electronic copies of the foregoing filing were served to all attorneys of record.

*/s/ Jessica L. Griff*